**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                :
BRANDON LYMAN,                  :     CIVIL ACTION NO. 08-5303 (MLC)
                                :
      Plaintiff,                :     MEMORANDUM OPINION
                                :
      v.                        :
                                :
TIMOTHY P. LONG, et al.,        :
                                :
      Defendants.               :
_____:
```

**COOPER, District Judge**

Plaintiff, Brandon Lyman ("Lyman") brings this action under 42 U.S.C. § ("Section") 1983 against defendants, Timothy P. Long ("Long") and Kenneth W. Zahn ("Zahn"), both police officers in the City of Trenton (collectively, "Defendants"). (Dkt. entry no. 1, Compl.)  Defendants separately move for summary judgment in their favor pursuant to Federal Rule of Civil Procedure ("Rule") 56.  (Dkt. entry no. 29; dkt. entry no. 30).  Lyman opposes the separate motions.  (Dkt. entry no. 33.)  The Court determines the separate motions on the briefs without an oral hearing, pursuant to Rule 78(b).  For the reasons stated herein, the Court will grant in part and deny in part the separate motions for summary judgment.

**BACKGROUND**

Trenton police officers were summoned to Trenton Central High School West ("TCHSW") on May 10, 2007.  (Dkt. entry no. 31, Wilson Cert., Ex. E, Rowell Dep. at 21.)  Sometime between eleven

o'clock and noon the fire alarm went off, and Lyman, among others, proceeded outside. (Wilson Cert., Ex. C, Lyman Dep. at 31-32.) Contemporaneously, school security guards had been summoned to a disturbance in the cafeteria, which also emptied outside. (Rowell Dep. at 15-18, 20.) In all, over one hundred students were outside of the school. (Id. at 27.)

Once outside, Lyman had a verbal dispute with another student. (Lyman Dep. at 32-34.) A school security guard, Samuel Rowell ("Rowell") said that Lyman was very upset and he tried unsuccessfully to calm him down. (Rowell Dep. at 34-37, 45.)[1] Rowell testified to having a "pretty good relationship" with Lyman, and that before the police came he "held [Lyman]" for awhile, trying to calm him down, and warned him that once the police arrived, they were going to "lock [him] up," especially if he did not calm down or was fighting. (Id. at 44, 39.)[2] Rowell said he had "never seen [Lyman] act like that." (Id. at 45.) He said that Lyman kept "trying to get after" the other student.

---

[1] It is not clear when this dispute started or what it was about. Lyman testified he did not remember. (Lyman Dep. at 33.) Rowell believed it had to do with another incident involving a female student who was possibly his cousin. (Rowell Dep. at 21, 27, 36.) Lyman also alluded to being upset that another friend of his had been "jumped" earlier. (Lyman Dep. at 58.)

[2] Rowell was asked "I guess you're indicating that you put your arms around him almost like in a hug?" He responded "Yeah, to hold him. Yes, exactly." (Rowell Dep. at 71.)

2

(Id. at 35, 36, 58, 80.)[3]  After a short period of time, Rowell testified that Lyman "broke away" from him, after which he saw Lyman running towards the front door.  (Rowell Dep. at 39.)

Lyman, however, testified that the person he argued with was "actually a friend" of his, the dispute "wasn't like a big, major blown-out dispute," it was not physical "at all," they were not face to face or right next to each other, and that it lasted for "no longer than 10 seconds."  (Lyman Dep. at 32-34.)  Lyman also said that Rowell merely had his hand on his chest and speculated that Rowell was "just trying to calm [them] both down . . . Just in case something was going to happen."  (Id. at 35.)

It is unclear from Rowell's testimony what he saw next: first he said he could see nothing, as the entire lawn "was full with police and kids," then he noted seeing several police officers surrounding Lyman and "pretty much holding" him, but he later responded to the question "Did you see the cops have their hands on [Lyman]?" with "No," and "Actually, you couldn't see nothing.  It was a big crowd of people right here in front of the building."  (Rowell Dep. at 39, 41, 63.)  In any case, the principal ordered Rowell inside to put the rest of the school on lock-down while the police handled it outside.  (Id. at 35, 37.)

_____

[3] Rowell used the phrase "get after" or "get at" several times in his deposition.  The definition of this phrase is hinted at, but neither party ever satisfactorily elicited whether it means to actually physically assault someone, or simply to verbally confront someone.  (See Rowell Dep. at 35, 58, 78-81.)

Lyman stated that the next thing he knew, "five or six officers, like they came up and grabbed me or whatever, like aggressively, and I thought it was . . . an over-reaction because it wasn't like we were fighting or anything . . . ."  (Lyman Dep. at 34.)  Lyman claims Trenton police officers kneed him in the stomach, threw him on the ground, and put handcuffs on him.  (Id. at 39-40.)  Then, despite claiming that he yelled "I'm complying, I'm complying," Lyman alleges Long punched him in the face approximately ten times.  (Id. at 39, 41, 47.)  He claims that his hands were not flying about.  (Id. at 42.)  He also claims Long and Zahn both participated in this allegedly unlawful arrest.  (Compl. at 2.)  Finally, upon being put into the back of a police car, Lyman alleges that Long said "[y]ou gave me a good reason to let out my aggression 'cause I was arguing with my wife last night."  (Lyman Dep. at 49.)

Rowell testified that the scene outside TCHSW was "just kids yelling, everybody was arguing.  It was just a big mayhem." (Rowell Dep. at 27.)  He said it was "a mess. . . . I never seen so many police. . . . I never seen nothing that out of control . . . it was just crazy.  I mean kids were everywhere."  (Id. at 23.)  Long's police report states that he, along with Zahn, arrived at TCHSW "on the report of a street fight."  (Wilson Cert., Ex. C, P-1, Police Report.)  Rowell's incident report later noted, though, that "[t]he only reason it look [sic] like a brawl is because the fire alarm was pull [sic] and all the kids

4

ran out of building on the front lawn."  (Wilson Cert., Ex. E at 33, Rowell Incident Report.)

Lyman's mother, Allena Marie Smith ("Smith") testified she received a call from someone at the school who told her that the fire alarms went off and that police officers were surrounding her son.  (Wilson Cert., Ex. D, Smith Dep. at 23.)  She arrived in "[a]bout 12 minutes, if that," and described the scene at the school as "chaotic . . . A lot of kids they were putting into the wagon and it was just not a nice scene."  (Id. at 23, 27.)  However, she did not observe any kids fighting.  (Id. at 27.)  She said when she got there she saw the police putting Lyman on the ground and handcuffing him, and that his face had bruises.  (Id. at 20.)  Her understanding was that they hit him before she arrived.  (Id. at 31-32.)

Lyman was taken to the police station and released to his mother's custody about an hour later.  (Id. at 39, 44.)  Smith and Lyman next went to Internal Affairs, where Smith filed a complaint.  (Id. at 40-41.)[4]  After letting her job know she was taking the rest of the day off, Smith took Lyman to the hospital.  (Id. at 41-42.)  Lyman claimed pain in his neck, lower back, and "intraoral pain."  (Wilson Cert., Ex. F., Lyman Med. Recs. at

_____

[4] It is not entirely clear if the complaint was filed on May 10 or July 10, as the Internal Affairs Report notes that it was "entered" on the later date.  (Dkt. entry no. 33, Gies Aff., Pa1, Internal Affairs Report.)

10.)  A doctor noted some scratches on his neck and face and an "intraoral lac in mouth."  (Id. at 10.)  Lyman was diagnosed with some contusions, and released with the recommendation to treat the injuries with ice and Motrin.  (Id. at 4.)

Long was notified of the Internal Affairs complaint against him on July 15, 2007.  (Internal Affairs Report.)  He was eventually exonerated of the excessive force claim by Internal Affairs.  (Id.)  Smith filed a tort claims notice with the City of Trenton on July 18, 2007.  (Pl. Opp'n at 8.)

On or about September 12, 2007, Lyman and Smith received a notice of a Juvenile Complaint proceeding against him, charging him with violations of N.J.S.A. §§ 2C:33-2a and 2C:29-2a, essentially disorderly conduct and resisting arrest.  (Wilson Cert., Ex. C, P-2, Juvenile Delinquency Compl.)  They were also notified the case would be handled by an "Intake Services Conference" ("ISC").  (Gies Aff., Pa14, ISC Notice.)[5]  Lyman said he met with a "juvenile referee," and they discussed the incident.  (Lyman Dep. at 79-81.)  Lyman felt he had received a lecture, and that the gist of the conversation was that the referee figured he was a good kid and that he should "try not to get into situations like this."  (Id. at 83.)  Lyman's

_____

[5] It appears that there was a single ISC conference, which was held on January 8, 2008, but the initial notice states that it was to be held on September 19, 2007. (Lyman Dep. at 80; Wilson Cert., Ex. C, P-3, ISC Order; ISC Notice.)  The parties do not offer an explanation for this discrepancy.

6

understanding was that he was not charged with anything further, did not have to meet any conditions or do any community service, and he "remembered [the referee] said he was going to recommend that [the charges] be dismissed." (Id. at 79, 84-85.) The "ISC Agreement/Order" ("ISC Order") contains the illegible name of a "Probation Officer" and is signed by Lyman and Smith. (ISC Order.) Under the heading "Recommendation" the box entitled "Case Closed with a Lecture" is checked. (Id.) There is also space under the heading "Judge's Approval" and the statement "The above matter, having been closed by Intake upon satisfactory adjustment by above mentioned parties, is hereby dismissed" for a judge's signature, but this section of the ISC Order is blank. (Id.)

Plaintiff asserts three Section 1983 claims under the Fourth Amendment to the United States Constitution: false arrest, excessive force, and malicious prosecution. (Compl.) Defendants now separately move for summary judgment in their favor. (Dkt. entry no. 29, Zahn Br.; dkt. entry no. 31, Long Br.)

**DISCUSSION**

## I.   Summary Judgment Standard

The standard for a motion for summary judgment is well-settled and will be briefly summarized. Rule 56 provides that summary judgment is proper if there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law.  Fed.R.Civ.P. 56.  In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor."  United States ex rel. Josenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (citing Abramson v. William Patterson Coll., 260 F.3d 265, 276 (3d Cir. 2001)).

The movant has the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The movant may satisfy this burden by showing "that there is an absence of evidence to support the nonmoving party's case" when the non-moving party bears the ultimate burden of proof at trial.  Id. at 325.  Once the movant has met this burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial.  Id. at 324.

## II.  Section 1983 Claims

A plaintiff asserting civil rights violations under Section 1983 must establish that the defendant acted under color of state law to deprive him or her of a right secured by the United States Constitution or the laws of the United States.  Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  Section 1983 does not create substantive rights, but instead provides a remedy for the violation of rights created by other federal laws.  Id.; Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

8

For a plaintiff's Section 1983 claims to survive a motion for summary judgment there must be a genuine issue of fact as to whether the defendant (1) acted under color of state law, or (2) deprived the plaintiff of a federal right.  Groman, 47 F.3d at 633.  "The color of state law element is a threshold issue; there is no liability under [Section] 1983 for those not acting under color of law."  Id. at 638.  Police officers are considered state actors.  Gale v. Storti, 608 F.Supp.2d 629, 634 (E.D. Pa. 2009).

### A.    False Arrest Claim

A police officer is prohibited from arresting a person without probable cause.  U.S. Const., amend. IV; Herbert v. Lech, No. 03-3852, 2006 WL 278907, at *3 (D.N.J. Feb. 2, 2006).  Probable cause exists when the facts and circumstances are "sufficient to warrant a prudent [person] in believing that the [arrestee] had committed or was committing an offense."  Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (quotation and citations omitted); Sharrar v. Felsing, 128 F.3d 810, 817-18 (3d Cir. 1997).  "Probable cause to arrest requires more than mere suspicion; however, it does not require that the officer have evidence to prove guilt beyond a reasonable doubt."  Orsatti v. N.J. State Police, 71 F.3d 480, 482-83 (3d Cir. 1995).  Thus, a defense to an unlawful arrest claim is that the defendant police officers acted with probable cause.  Dowling v. City of Phila., 855 F.2d 136, 141 (3d Cir. 1988) (noting that existence of

9

probable cause is threshold issue for false arrest claim).
"[T]he existence of probable cause is usually a jury question,"
unless "no genuine issue as to any material fact exists and where
credibility conflicts are absent." Rhames v. Sch. Dist. of
Phila., No. 01-5647, 2002 WL 1740760, at *4 (E.D. Pa. July 17,
2002).

Long and Zahn are not entitled to summary judgment as to the
issue of probable cause, as there are disputed issues of material
fact as to whether the circumstances surrounding Lyman's arrest
were sufficient to warrant a prudent person to believe that Lyman
had committed or was committing an offense.  Lyman was arrested
and charged with disorderly conduct in violation of N.J.S.A. §
2C:33-2a.  (Long. Br. at 5.)  That statute provides:

> a. Improper behavior. A person is guilty of a petty
> disorderly persons offense, if with purpose to cause
> public inconvenience, annoyance or alarm, or recklessly
> creating a risk thereof he
>
> (1) Engages in fighting or threatening, or in violent or
> tumultuous behavior; or
>
> (2) Creates a hazardous or physically dangerous
> condition by any act which serves no legitimate purpose
> of the actor.

N.J.S.A. § 2C:33-2a.[6]  Whether Lyman acted in such a manner

---

[6] Long asserts that "Defendant had reasonable information to
believe that Plaintiff was committing the crimes for which he was
ultimately charged, which are failing to submit to lawful arrest
and creating a hazardous condition by an act that served no
legitimate purpose."  (Long. Br. at 9.)  But the former does not
logically make sense: if Lyman was not yet being arrested, he
could not possibly be failing to submit to same.  Thus this

depends on Lyman's conduct during the incident at issue, a subject of factual dispute among the parties.  For example, Long argues Lyman "was out of control and failed to comport himself in a rational manner."  (Long Br. at 9.)  He further describes that:

> The scene at [TCHSW] could be described as nothing but complete mayhem.  Mr. Rowell testified that the situation was the most out of control he experienced during his many years [there] . . . Both [Lyman] and his mother described the scene as chaotic and confusion-filled . . . [Lyman] was angry that his friend was involved in a fight, and he was still angry when he left [TCHSW] . . . Mr. Rowell described [Lyman] as more upset that Mr. Rowell had ever seen [him]. . . Mr. Rowell talked to [Lyman] with his hand on [Lyman's] chest, trying to calm [Lyman] down . . . [Lyman] was not listening to Mr. Rowell.

(Id. at 8-9.)  Zahn notes that "[a]ccording to Rowell's own words, they were 'tussling' and it was tiring him out.  He said that Lyman was too strong for him and broke away from him."  (Dkt. entry no. 35, Zahn Rep. at 2.)  Notably, both Long and Zahn rely on the testimony of what Rowell, Lyman, and Smith witnessed, and do not assert making any of these observations themselves.[7]

---

alleged conduct cannot contribute to the existence of probable cause.  Defendants do not allege that Lyman's interaction with Rowell manifested resistance to arrest, or provide authority for same, thus the Court does not consider the possibility.  In any case, Lyman's very conduct at that moment, and what the officers observed of it, are issues of fact precluding summary judgment.

[7] The police report, written by Long and approved by Zahn, refers to "wrestling" (Police Report), but this is not further alleged from the first-person in any of Defendants' briefing.  Moreover, both Defendants use Lyman's description of Rowell's hand on his chest instead.  (See Long Br. at 2; dkt. entry no. 29, Zahn Stmt. of Facts at 3; dkt. entry no. 31, Long Stmt. of Facts at 2.)

There are also, however, conflicting accounts as to these facts, as Lyman asserts that he was merely "part of a crowd of students who left the high school building as a result of a fire alarm." (Pl. Opp'n at 6.)  Lyman points out that Rowell "did not see the police officers present when he tried to calm" him down and that Rowell "did not see [him] punch or hit anyone in the crowd." (Id. at 5.)  Lyman also testified that the person he argued with was a friend, that the dispute was not major or physical, that they were not face to face, and that it lasted for "no longer than 10 seconds." (Lyman Dep. at 32-34.)

Defendants have not presented any information indicating how they determined the existence of probable cause.  They do not allege that anyone in the administration told them Lyman was committing any offenses.  See C.H. v. Rankin Cnty. Sch. Dist., No. 08-84, 2009 WL 900726, at *5 (S.D. Miss. Mar. 30, 2009) (probable cause where arresting officers were told that a high ranking school official actually saw fight), aff'd, Nos. 10-60380, 10-60697, 2011 WL 788908, at *3 (5th Cir. Mar. 4, 2011).  Nor have Defendants attested to what they personally saw of Lyman's conduct.  See Alexander v. Underhill, No. 05-178, 2008 WL 822261, at *4-5 (D. Nev. Mar. 26, 2008) (issue of fact where arrestee's specific conduct during the course of fight was not presented, and it was not clear whether arrestee did anything to cause officer to believe he had been involved; "Stated another

way, there are factual questions related to why [the officer] believed [arrestee] was involved in the fight.")

In sum, there are conflicting accounts of what Lyman was doing when the police arrived, and, more importantly, what exactly Long and Zahn themselves witnessed that led them to arrest Lyman.  This is admittedly a close case because of the "chaotic" scene at the school and Long's police report that notes seeing Lyman and Rowell "wrestling."  But because the characterization of that interaction varies among the parties, and because both the timeline between Lyman's breaking away from Rowell and being arrested by the officers, and Lyman's conduct during that timeline, are unclear, a jury's decision to credit one of the accounts over the others could lead to differing findings of fact.  Thus, the Court finds the issues of fact are sufficiently material to prevent Defendants from prevailing on summary judgment on the claim of unlawful arrest.  See Rhames, 2002 WL 1740760, at *4.

**B.   Excessive Force**

Claims of excessive force by a police officer during an arrest are evaluated under the Fourth Amendment's "objective reasonableness" standard.  Brosseau v. Haugen, 543 U.S. 194, 197 (2004); Boardman v. Riverside Twp., No. 04-5779, 2007 WL 2066383, at *2 n.1 (D.N.J. July 13, 2007).  Thus, a plaintiff alleging excessive force during an arrest must demonstrate that the

13

defendant officer's seizure of the plaintiff was unreasonable. Bornstad v. Honey Brook Twp., 211 Fed.Appx. 118, 123 (3d Cir. 2007).  "[R]easonableness is evaluated under a totality of the circumstances analysis, which asks whether 'the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them without regard to their underlying intent or motivations." Id.  In evaluating the reasonableness of an officer's actions, the Court should consider, inter alia, (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to others' safety, (3) whether the suspect attempted to evade arrest, (4) whether the suspect was a violent or dangerous person, (5) the duration of the police action at issue, (6) whether the police action at issue occurred during an arrest, (7) whether there was a possibility that the suspect was armed, and (8) the number of persons with whom the officer had to contend with at one time.  Id.

A police officer's failure to intervene during another officer's use of excessive force can also constitute excessive force in violation of the Fourth Amendment.  Yarnall v. Mendez, 509 F.Supp.2d 421, 433 (D. Del. 2007).  To establish such a violation, a plaintiff must show that the police officer (1) failed or refused to intervene when a constitutional violation took place in the officer's presence or with the officer's knowledge, and (2) had a realistic and reasonable opportunity to

14

intervene.  Id.  "[I]t is plaintiff's burden to adduce evidence of both requirements."  Id.

Lyman argues that summary judgment as to his excessive force claim should be denied because there is a genuine issue of material fact as to "whether the defendants observed the plaintiff wrestling with the security guard when they arrived at the scene" and "the degree of force need[ed] to subdue the plaintiff in this instance."  (Pl. Opp'n at 10-11.)

### 1. Officer Long

As discussed above, there are conflicting accounts of Lyman's conduct and what the police observed of it.  Lyman argues that Long "admitted in the police report that he punched the plaintiff," twice with a closed fist, although Lyman claims it was about ten times.  (Id. at 10.)  Long's brief does not make a claim as to what Lyman's conduct was at that moment, but the police report states that Lyman "continued to swing his arms and legs wildly at officers."  (Police Report at 2.)  Conversely, Lyman claims his arms were not "flying" and that he yelled he was complying.  (Lyman Dep. at 41-42.)  Lyman further asserts Long told him soon after that "[y]ou gave me a good reason to let out my aggression 'cause I was arguing with my wife last night."  (Id. at 49.)  The Court finds these are genuine issues of material fact that prevent the Court from determining whether Long's conduct was objectively reasonable.  See Steele v. Jennings, No. 04-189, 2005 WL 2124152, at *6-9 (S.D. Ohio Aug.

31, 2005) (denying summary judgment to defendant on excessive force claim where question of fact as to whether force was used).

Long instead argues that because Lyman "misidentifies" him, Lyman cannot recover.  (Long. Br. at 11.)  However, in the cited cases, Long appears to ignore the difference between description and identification.  (Id.)  In Anela v. City of Wildwood, 790 F.2d 1063, 1065 (3d Cir. 1986), plaintiffs indicated which officers were on duty the night they were arrested, but did not present any evidence identifying which officers were responsible for their detention.  The Third Circuit Court of Appeals concluded that the trial court properly granted the individual defendants' motion for a directed verdict, in part because "plaintiffs had not specifically identified the individuals who booked them and locked them up."  Id. at 1065, 1068.  Similarly in Hill v. Algor, 85 F.Supp.2d 391, 404 (D.N.J. 2000), plaintiff conceded he could not "identify any of his attackers, because he 'put [his] head down.'"  The Hill court further noted that plaintiff "[did] not assert that [defendant police officer] physically abused him during this time."  Id. at 406.

There are obvious differences here.  Lyman identified Long specifically, both in the Complaint and in his deposition. (Compl.; Lyman Dep. at 39.)  Lyman testified he would be able to identify Long on sight.  (Lyman Dep. at 46.)  Moreover, Lyman asserts a further interaction with Long beyond the scuffle with

16

five or six officers, in that he alleges Long made the comment
about fighting with his wife the night before.  (Id. at 49.)
Finally, the police report specifically says that "I (Long) then
struck the Juv (Lyman) with a closed fist to the jaw area" and "I
then gave him a closed fist punch to the abdomen area."  (Police
Report.)  Thus, viewing facts in a light favorable to the non-
movant, the Court finds that Lyman can sufficiently identify Long
so as to make his claims of excessive force not "speculative."
(Long Br. at 12.)  The Court does the same with Long's argument
regarding Lyman's injuries, and finds that a jury could conclude
the medical record supports Lyman's claimed injuries.  (Long Br.
at 12; Long Rep. at 5.)  Thus, the Court cannot grant summary
judgment in Long's favor on the excessive force claim.

### 2. Officer Zahn

The Complaint does not allege that Zahn treated Lyman with
excessive force, either directly or under a failure to intervene
theory, rather only that Zahn assisted Long in unlawfully
arresting Lyman.  (See Compl. at 2.)  Nor does Lyman provide any
evidence against Zahn on this issue in his opposition papers on
this motion.  Thus, the Court will grant the motion for summary
judgment in favor of Zahn on the excessive force claim.

### C.  Qualified Immunity

Long and Zahn are entitled to qualified immunity as to the
false arrest claim, and Long as to the excessive force claim,

17

regardless of whether their conduct violated Lyman's constitutional rights, if "a reasonable officer could have believed that [his] conduct was lawful, in light of the clearly established law and information in [his] possession." Berg v. Cnty. of Allegheny, 219 F.3d 261, 272 (3d Cir. 2000) (quotation and citations omitted); see also Siegel v. Miller, 446 F.Supp.2d 346, 352 (E.D. Pa. 2006). It is Defendants' burden to establish that they are entitled to qualified immunity; that is, they must show their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

Qualified immunity is evaluated under a two-step objective reasonableness test. Barton v. Curtis, 497 F.3d 331, 335 (3d Cir. 2007). Courts have the discretion to address the two steps in either order. Pearson v. Callahan, 129 S.Ct. 808, 821 (2009). The Court must consider whether the facts alleged, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. Barton, 497 F.3d at 335; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007). If a violation could be made out on a favorable view of the parties' submissions, the Court must then determine whether the right was clearly established, or "in other words, whether it would be clear to a reasonable officer that his conduct was unlawful in

18

the situation [the officer] confronted." Id. (quotation and
citation omitted). This step "addresses whether, if there was a
wrong . . . the officer made a reasonable mistake about the legal
constraints on his [or her] actions and should therefore be
protected against suit". Id. The answers for both of these
questions must be in the affirmative for the suit to go forward;
if a constitutional right was not violated, or even if it appears
it was, if that right was not clearly established, the defendant
is entitled to summary judgment. See Pearson, 129 S.Ct at 820
("There will be cases in which a court will rather quickly and
easily decide there was no violation of clearly established law
before turning to the more difficult question whether the
relevant facts make out a constitutional question at all.")

     The reasonableness step of the immunity analysis is a
question of law for the Court to decide. Curley, 499 F.3d at
211.  However, if there are historical facts material to the
determination of reasonableness in dispute, then those issues of
fact may be decided by a jury. Barton, 497 F.3d at 335; Sharrar,
128 F.3d at 828.  The Court may use special interrogatories to
allow juries to perform this "advisory" function. Curley, 499
F.3d at 211 n.12; Carswell v. Bor. of Homestead, 381 F.3d 235,
242 (3d Cir. 2004).  Once the historical facts are no longer in
dispute, however, the Court must make the ultimate determination
on the availability of qualified immunity as a matter of law.
Carswell, 381 F.3d at 242.

After resolving all factual disputes in favor of Lyman here, the facts alleged, if proven, show that Defendants arrested Lyman without probable cause, and that Long handled him with excessive force, thus violating Lyman's Fourth Amendment rights. See Barton, 497 F.3d at 335; Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004) (holding that first step of qualified immunity analysis satisfied, as plaintiff put forth facts sufficient, if proven, to establish Fourth Amendment excessive force violation).

The Court therefore will address the second step of the qualified immunity analysis. The requirement of probable cause before a police officer may arrest an individual is clearly established. Russoli v. Salisbury Twp., 126 F.Supp.2d 821, 842 (E.D. Pa. 2000). However, "even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." Id. (quotations and citations omitted). It is also clearly established that an officer's use of force during arrest must be reasonable to comport with the Fourth Amendment. See Williams v. Dellorco, No. 05-4129, 2007 WL 4171653, at *13 (D.N.J. Nov. 20, 2007); Miller v. Woodhead, No. 08-3092, 2011 WL 817556, at *4 (D.N.J. Mar. 2, 2011).

As discussed supra, there are disputed issues of fact as to both Lyman's conduct during the incident at issue, and what exactly Long and Zahn witnessed Lyman doing. The Court therefore cannot decide whether a reasonable police officer would

20

understand that Defendants' conduct would violate Lyman's Fourth Amendment rights without establishing the historical factual circumstances surrounding Lyman's arrest.  See Curley, 499 F.3d at 211 n.12; see also, Wagner v. Riverside Twp., No. 04-839, 2007 WL 4226069, at *8 (D.N.J. Nov. 26, 2007) (denying summary judgment and qualified immunity application to defendants where existence of probable cause for disorderly conduct arrest unclear).  As a result, Long and Zahn are not entitled to qualified immunity at this juncture on the false arrest claim, and Long is not entitled to qualified immunity on the excessive force claim.  Rather, the historical facts surrounding Lyman's arrest, and the force applied by Long, must be established before the Court can determine, as a matter of law, whether reasonable officers would have acted as Defendants did under the circumstances.  See Curley, 499 F.3d at 211 n.12; Alexander, 2008 WL 822261, at *5.

### D.  Malicious Prosecution Claim

Lyman further alleges that Long prosecuted juvenile charges against him maliciously, arguing he did not receive the juvenile complaint until four months after the incident and two months after Long was notified of the Internal Affairs complaint. (Compl.; Pl. Opp'n at 8.)[8]  Section 1983 recognizes claims for

---

[8] Lyman agrees the Complaint does not assert this claim against Zahn.  (Pl Opp'n at 6 n.3.; Compl. at 3-4.)

malicious prosecution under the Fourth Amendment if the plaintiff can demonstrate that (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.  Johnson v. Knorr, 477 F.3d 75, 82-81 (3d Cir. 2007).  "Failure to prove any one of these  . . . elements denies the plaintiff a cause of action for malicious prosecution."  Wiltz v. Middlesex Cnty. Office of the Prosecutor, No. 05-3915, 2006 WL 1966654, at *9 (D.N.J. July 10, 2006); see also Kossler v. Crisanti, 564 F.3d 181, 193 (3d Cir. 2009).

"[O]ne element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused."  Heck v. Humphrey, 512 U.S. 477, 484 (1994) (emphasis added).  This is established "when the plaintiff is 'innocent of the crime charged in the underlying prosecution.'"  Pittman v. Metuchen Police Dep't, No. 08-2373, 2010 WL 4025692, at *7 (D.N.J. Oct. 13, 2010) (citing Hector v. Watt, 235 F.3d 154, 156 (3d Cir. 2000)).  "[A] malicious prosecution claim cannot be predicated on an underlying criminal proceeding which terminated in a manner not indicative of the innocence of the accused."  Kossler v. Crisanti, 564 F.3d 181, 187 (3d Cir. 2009).

22

Although the formal abandonment of proceedings by the prosecutor can constitute favorable termination, this is not always the case; "[a] [nolle prosequi] signifies termination of charges in favor of the accused only when their final disposition is such as to indicate the innocence of the accused." DiFronzo v. Chiovero, No. 10-1849, 2011 WL 94545, at *2-3 (3d Cir. Jan. 12, 2011) (internal quotations and citations omitted).  The DiFronzo court held that because the order granting the motion seeking nolle prosequi did not indicate plaintiff's innocence, and nothing else in the record stated why the motion was filed or granted, the criminal charges at issue were not terminated in plaintiff's favor.  Id.  Thus, because plaintiff failed to present "any information indicating 'the innocence of the accused,'" plaintiff was unable to satisfy the second element required to support a claim of malicious prosecution.  Id. at 3; see also Pittman, 2010 WL 4025692, at *7 ("If the prosecutor drops the charges as part of a compromise with the accused, the accused will fail the favorable termination prong . . . .").

The prior criminal proceeding here that allegedly terminated in Lyman's favor is his juvenile complaint, which was diverted to an ISC pursuant to N.J.S.A. §§ 2A:4A-70-2A:4A-74.  (See ISO Order.)  The resolution of an ISC "may include but shall not be limited to counseling, restitution, referral to appropriate community agencies, or any other community work programs or other conditions consistent with diversion . . . ."  N.J.S.A. §

23

2A:4A-74d.  "At the end of the diversion period a second court intake services conference may be held with all parties . . . . If all conditions have been met, the intake worker shall so inform the presiding judge in writing who shall order the complaint dismissed.  A copy of the order dismissing the complaint shall be sent to the juvenile."  N.J.S.A. § 2A:4A-74e.

The statute does not specify what happens where, as here, the proceeding ends after only one ISC, or what effect such a disposition has on the question before the Court.  However, State in Interest of A.H., 304 N.J. Super. 34, 36 (N.J. Super. Ct. 1997) examined, for double jeopardy purposes, the effect of a dismissal by a "juvenile referee" in a similar "informal counsel-non-mandatory referee proceeding."  The A.H. court noted that New Jersey Court Rule ("NJ Rule") 5:25-2 states "[t]he recommendations of the referee shall be without effect unless approved by the court and incorporated in an appropriate order or judgment of the court."  Id. at 40.  Thus, because the court had yet to act on the referee's decision, it determined that:

> The referee's recommendation of dismissal amounts to an administrative decision yet to be ratified by the court; . . . a nullity.  A referee designated per R. 5:25-2 is not a "trier of fact" whose recommendation enjoys judicial consequence absent ratification by the court; on the contrary, the very ratification process contemplated and mandated by the rule acknowledges and affirms the constitutional mandate that only judges of the Superior Court enjoy the power and obligation to discharge the duties of the judicial branch of our state government.

Id. at 41-42.

24

Although the proceeding here was an ISC, not a refereed trial, and the title of the presiding officer on the ISC Order is "probation officer," Lyman referred to this person as a "juvenile referee." (See ISC Order; Lyman Dep. at 79, 81.) There is also space on the ISC Order for a judge's signature under the statement "The above matter, having been closed by Intake upon satisfactory adjustment by above mentioned parties, is hereby dismissed." (ISC Order.) While the status of individuals presiding over ISCs is not entirely clear, it stands to reason that, if not identical, the power of these individuals would certainly not exceed those of referees in informal trial proceedings. Thus, for the purposes of this motion, the Court determines that the ISC Order, as presented, is an "administrative decision yet to be ratified" by a court. See A.H. 304 N.J. Super. at 42. Lyman contends that "[t]he charges were dismissed," and testified that "I just remember [the judicial referee] said he was going to recommend that they be dismissed." (Pl. Opp'n at 7; Lyman Dep. at 85.) But the ISC Order was not signed by a judge, and Lyman presents no other evidence that it was actually dismissed by an appropriate judicial authority. (ISC Order.) See N.J.S.A. § 2A:4A-74e; NJ Rule 5:25-2.

The Court further determines that, apart from mere speculation, Lyman has not presented any evidence indicating that

the ISC proceedings ended with any findings of actual innocence in his favor.  Aside from failing to demonstrate the juvenile complaint was dismissed, he has not presented any findings, even by the probation officer at the ISC, indicating his innocence of the charges at issue.[9]  In addition, the statute governing ISCs provides that

> The court intake service worker shall inform the juvenile and the juvenile's parents or guardian in writing of their right to object . . . to the facts or terms of the intake conference decision, and if objections arise, the intake service worker may alter the terms of the proposed agreement or refer the matter to the presiding judge who shall determine if the complaint will be heard in court or returned to intake conference for further action.

N.J.S.A. § 2A:4A-74d(2).  But here, Lyman and Smith signed the ISC Order, neither objected to its disposition lacking any specific finding or statement, then or now, and Lyman does not now claim that his right to object was somehow violated.  Consequently, the Court cannot find that the proceeding ended in Lyman's favor, which precludes satisfaction of the favorable termination element required to succeed on a claim for malicious prosecution.[10]

---

[9] Lyman contends that because the case was closed after he explained his version of the incident, "arguably, the probation officer found [it] credible."  (Pl. Opp'n at 7.)  However, this does not suffice for providing actual evidence of innocence.

[10] The Court also notes a document titled "State in the interest of Brandon Lyman," signed on the same day as the ISC Order, in which boxes "non-mandatory" and "plea" are checked. (Wilson Cert., Ex. C, P-4.)  Neither party comments on its significance.

"[D]istrict courts need not reach the probable cause element unless they first make a finding of favorable termination. . . . Only if [that] element is satisfied . . . must a district court engage in an analysis of the probable cause element."  Kossler, 564 F.3d at 194.  Thus the Court need not examine Long's other arguments because Long is entitled to summary judgment on Lyman's malicious prosecution claim.

## CONCLUSION

For the reasons stated supra, the Court will grant in part and deny in part the separate motions for summary judgment.  The Court will issue an appropriate order.


       s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge


**Dated:**   April 20, 2011